**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JOSEPH A. LAROSKI JR., JUDGE**

-------------------------------------------------------------------- X

VIECURA INC.                              :
                                          :
        **Plaintiff,**                  :
                                          :
        *v.*                           :     **Consol. Court No. 21-00154**
                                          :
UNITED STATES,                            :
                                          :
        **Defendant.**                 :

-------------------------------------------------------------------- X

## <u>PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

*Counsel for Plaintiff*

John M. Peterson
Richard F. O'Neill
Patrick B. Klein
Sanzida Talukder
Neville Peterson LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Herbert J. Lynch
Sullivan and Lynch, PC
800 Turnpike St., Suite 300
North Andover, MA 01845
Lynch@s-l.com

Dated: August 29, 2025

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT .......................................1

STATEMENT OF THE CASE ......................................................................................1

ARGUMENT ................................................................................................................6

I.    Summary Judgment is Not Appropriate in This Case. .....................................6

    A.    The Court's Sole Function in Addressing a Summary Judgment Motion is to
           Determine Whether There are Disputed Facts Requiring Trial. ............................6

    B.    The Court May Not Weigh Evidence on a Summary Judgment Motion.................7

    C.    The Government Agrees That Chronic Incontinence is a "Handicap."...................9

II.   Numerous Material Facts in Dispute Preclude Summary Judgment. ...............12

    A.    Common Features With "Regular" Underwear. ..................................................12

    B.    Disputed Facts Regarding if Post Maternity Incontinence is a Chronic or
           Acute/Transient Condition ...............................................................................17

    C.    There are Disputed Facts Concerning the Sigvaris Factors. ................................21

CONCLUSION ...........................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs v. Torpharm Inc.*, 300 F.3d 1367 (Fed. Cir. 2007). .................................................. 8

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .................................................. 6, 7, 9, 17

*Carl Zeiss, Inc. v. United States,* 195 F.3d 1375 (Fed. Cir. 1999). .............................................. 18

*Cyber Power Sys. (USA) Inc. v. United States,* 560 F. Supp. 3d 1347 (Ct. Int'l Tr. 2022) ........... 8

*Danze, Inc. v. United States*, 319 F. Supp. 3d 1312 (Ct. Int'l Tr. 2018) ...................................... 9

*Eastalco Aluminum Co. v. United States*, 10 C.I.T. 622 (1986) ................................................ 23

*Ezeah v. Executive Office of U.S. Attorneys*, 2025 U.S. Dist. LEXIS 138908 (D.D.C. 2025) ................................................................................................................................................ 7

*Fifth Third Bank of W. Ohio v. United States,* 55 Fed. Cl. 223 (2003) ...................................... 8

*Fountain v. Filson*, 336 U.S. 681 (1949) ..................................................................................... 8

*Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303 (Fed. Cir. 2013) .................................... 17

*Goodman Mfg. L.P v. United States,* 69 F.3d 505 (Fed. Cir. 1995). ........................................... 5

*Ideal Innovations, Inc. v. United States*, 2021 U.S. App. LEXIS 35730 (Fed Cir. 2021). ............ 9

*In-Zone Brands Inc. v., United States*, 456 F. Supp. 3d 1309 (Ct. Int'l Tr. 2020) ...................... 21

*Lemelson v. TRW, Inc*., 760 F.2d 1254 (Fed. Cir. 1985) ............................................................... 8

*Mayer/Berkshire Corp. v. Berkshire Fashion Inc*., 424 F. 3d 1229 (Fed. Cir. 2005).................... 7

*Mishko v. Redleo Software Inc*., 2025 U.S. Dist. LEXIS 44459 (E.D. Tex. 2025). ....................... 7

*Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048 (Ct. Int'l Tr. 1988) ................................. 6

*Res. Club Ltd. v. United States*, 31 C.I.T. 755 (2007) ................................................................. 7

*Sigvaris Inc. v. United States*, 227 F. Supp. 3d 1327 (Ct. Int'l Tr. 2017)............................ 2, 9, 22

*Sigvaris, Inc. v. United States*, 899 F.3d 1308 (Fed. Cir. 2018) ......................................... 21, 22

*Stewart-Warner Corp. v. United States*, 748 F.2d 663 (Fed. Cir. 1984) .................................... 21

*Tesler v., Miller-Howard Invs. Inc*., 2019 U.S. Dist. LEXIS 32831 (S.D. Ind. 2019). ............... 17

*Texas Apparel Co. v. United States*, 698 F. Supp. 932 (Ct. Int'l Tr. 1988)................................... 6

*United States* v. *Baltimore & Ohio Railroad Co*., 47 C.C.P.A. 1 (1959).................................... 23

*Wi-LAN United States v. Ericsson Inc*., 675 Fed. Appx. 984 (Fed. Cir. 2017) ............................ 8

**Statutes**

28 U.S.C. § 1581 ............................................................................................................................ 2

**Other Authorities**

*Customs Headquarters Ruling 085084 of May 10, 1990*............................................................. 10

*Customs Headquarters Ruling 085092 of May 10, 1990*............................................................. 10

*Customs Headquarters Ruling 297341 of November 13, 2018* ................................................... 19

*Customs Headquarters Ruling 556449  of March 25, 1996* ........................................................ 18

*Customs Headquarters Ruling 558958 of March 25, 1996* ........................................................ 19

*Customs Headquarters Ruling 560278 of October 7, 1997*........................................................ 19

*Customs Headquarters Ruling 561223 of March 26, 1999* ........................................................ 23

*Customs Headquarters Ruling 960056 of January 30, 1997*...................................................... 19

*Customs Headquarters Ruling W562506 of October 28, 2002* ................................................... 19

Customs Implementation, 28 Cust. Bull. & Dec. 242 .................................................................. 23

Merriam-Webster Dictionary, definition of "acute," Merriam-Webster.com .............................. 18

Merriam-Webster Dictionary, definition of "chronic," Merriam-Webster.com ........................... 19

Merriam-Webster Dictionary, definition of "geriatric," Merriam-Webster.com ......................... 20

*New York Customs Ruling 330400 of February 7, 2023* ............................................................. 13

*New York Customs Ruling N305952 of September 11, 2019* ........................................ 13
*New York Customs Ruling N31147 of May 26, 2000* ................................................ 13
*New York Customs Ruling N349015 of June 11, 2025* .............................................. 23
*New York Customs Ruling N350595 of June 27, 2025* .............................................. 23
*New York Customs Ruling R02361 of September 1, 2005* .......................................... 13

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE HON. JOSEPH A. LAROSKI JR., JUDGE

```
-------------------------------------------------------------------- X
VIECURA INC.                                      :
                                                  :
            Plaintiff,                            :
                                                  :
      v.                                          :      Consol. Court No. 21-00154
                                                  :
UNITED STATES,                                    :
                                                  :
            Defendant.                            :
-------------------------------------------------------------------- X
```

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In accordance with Rules 7 and 56 of the Rules of the United States Court of International Trade ("USCIT R."), plaintiff Viecura, Inc. hereby opposes the motion of defendant United States to enter summary judgment in its favor on this matter. As described herein, the record, depositions, responses to interrogatories and other materials indicate that there are substantial fundamental issues of fact in dispute between the parties, making summary judgment improper.

This case should be set down for trial so that this Court, as the finder of fact, may receive and weigh evidence and make appropriate findings of fact and conclusions of law in this matter.

## STATEMENT OF THE CASE

This is a consolidated classification case in which the central issue is whether the merchandise at bar — specially-designed fixation pants for use as part of a two-piece incontinence care system — are entitled to secondary classification under subheading 9817.00.96 of the Harmonized Tariff Schedule of the United States ("HTSUS") and entitled to duty free treatment as:

> Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons; parts and accessories (except parts and accessories of braces and artificial limb prosthetics) that are specially designed or adapted for use in the foregoing articles: Other [than articles for the blind].

The goods were classified in liquidation by United States Customs and Border Protection ("Customs" or "CBP") under subheading 6108.22.90, HTSUS, as "Womens' or girls' briefs or panties, of man-made fibers," and were assessed with duties at the rate of 15.6% *ad valorem*, and, depending on date of entry, with Section 301 tariffs as products of China.

Plaintiff timely protested the liquidation of its entries, asserting a right to secondary classification under the Nairobi Protocol provisions codified at subheading 9817.00.96, HTSUS, and seeking a refund of duties. When its protests were denied by Customs, Viecura commenced the instant action to challenge said denial. This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).

The government has now moved for summary judgment in its favor. Plaintiff Viecura opposes the motion.

As discussed herein, summary judgment is only appropriate when no material issues of fact are in dispute between the parties. The threshold question for the Court in addressing such a motion is to determine whether material issues of fact remain in dispute. On summary judgment, the Court may not weigh evidence or make determinations on disputed factual issues. As discussed herein, a large number of material facts remain in dispute.

Thus, for example, defendant cites the Federal Circuit's decision in *Sigvaris Inc. v. United States*, 227 F. Supp. 3d 1327 (Ct. Int'l Tr. 2017), as setting out the factors "material" to a determination of whether an article is entitled to Nairobi Protocol treatment under subheading 9817.00.96, HTSUS. The first of these factors is the "physical properties" of the merchandise, showing whether the imported good is "specially designed" for use by the handicapped. In its Complaint in this action, ECF 10, plaintiff identifies several physical properties of the imported fixation pants which shows design for use by the handicapped. These include the fact, that the

pants are part of a 2-piece incontinence fixation system, *id.* at ¶ 12, are made using a circular-knit process, *id.* at ¶ 13, the presence of a wide waistband with substantial spandex content, *id.* at ¶ 15, the presence of elasticized leg openings, *id.* at ¶ 16, the presence of elastic bands inserted around the circumference of the polyester pants designed to hold the garment tight against the wearer's body and fix an absorbent pad securely, *id.* at ¶ 17, a seamless side construction which allows the spandex bands to maintain pressure to hold the garment tight against the body, *id.* at ¶ 18, the absence of a gusset in the crotch area, unnecessary because the wearer's genitals will make contact with the pad, not the bottom of the pants, *id*. at ¶ 19, and the presence of a deeper crotch area to allow room for the anatomically-shaped absorbent pad, *id*. at ¶ 20.  None of these features are commonly seen in underpants. Yet, the government has denied plaintiff's allegations as to each of these features, *see* Answer, ECF 16, at ¶¶ 12, 13, 15-20.  The Government's Rule 56.3 statement of material facts not in dispute mentions some of these features, but does not mention others, such as the presence of elastic bands around the circumference of plaintiff's pants, the seamless side construction, and the lack of a gusset. Thus, there are disputes regarding facts relating to the physical features of the imported garments — facts which the government itself concedes are material to the resolution of plaintiff's Nairobi Protocol claim under subheading 9817.00.96, HTSUS.  *See* Defendant's Brief ("Def. Br."), ECF 40, at 18-20.

Plaintiff's witness Joseph Gallagher testified at deposition that each of the physical characteristics identified in the Complaint specially dedicate the imported fixation pants for use by or for the benefit of physically handicapped persons suffering from chronic incontinence — a condition which the defendant admits is a "handicap" of a kind described in subheading 9817.00.96, HTSUS. *See* Response to Request for Admission, at 3 ("Exhibit 1"). *See* Gov. Exhibit 1, Gallagher Deposition ("Dep."), ECF 40-1 at 32-34, 35-36, 38-40, 41-44, 45-47, 57.  Defendant

acknowledges none of this in its motion, and alleges that "the knit underpants at issue have all the common features of regular stretch to fit underpants." *See* Def. Br. at 20. However, that is not the test. Nor is it the case. The subject fixation pants lack a gusset in the crotch area, which is a feature of all regular underpants. *See* Gallagher Dep. at p. 44:13-16 ("So the gusset is the piece -— is the area that is directly under the genital area. Where you would not find any seams in that area in normal underwear because you just don't do that."). *See also* Gallagher Dep. at 44:11-14 ("So in normal underwear, you know, again, to stress, you would always find a gusset. You have to have a gusset. People won't wear the product otherwise.);" Gallagher Dep. at p. 44:21-24 ("You can't have a seam in the crotch area. It's uncomfortable, and might even do yourself an injury with it. So in normal underwear, you don't find the seam in the crotch area.)."

Furthermore, it is undisputed that the subject merchandise features construction without side seams, and layers of tensioned elastic sewn into the polyester fabric, so that the garment will be held more tightly against a wearer's body and fix an absorbent pad in place. Plaintiff contends that these and other physical features of its merchandise dedicate it for the use or benefit of persons suffering the handicap of incontinence; defendant denies this. Thus, there are significant disputed questions of fact concerning the most basic of the *Sigvaris* factors. The government contends that there is a "lack of any clearly distinguishing features between Viecura's underpants and 'regular', *i.e.,* designed for non-handicapped, underpants," *see* Def. Br. at 20, but this is clearly and vigorously disputed.

If these the only material facts in dispute, they would be sufficient to preclude summary judgment. But, many other material issues of facts remain.

For instance, without citing an iota of evidence, defendant posits that post-partum incontinence or maternity incontinence is an "acute" or "transient" condition, and that plaintiff's

4

fixation pants are thereby excluded from Nairobi Protocol treatment pursuant to U.S. Note 4(b)(i) Chapter 98, Subchapter XVII, HTSUS. *See* Def. Br. at 8, 9, 15, and 16. Here, the Government states, without citation to evidence or authority, that "[i]t is evident that Viecura's (sic) sells its knit underpants as a maternity product, and the condition of maternity[1] is the quintessential temporary disability and not a permanent or chronic condition."[2] But this material issue of fact is hotly contested. Plaintiff's witness Joseph Gallagher testified that studies show post-partum incontinence is often chronic, lasting up to 24 months, s*ee* Gallagher Dep. at 155:14-17, and plaintiff's expert witness Dr. Bilal Chughtai also testified that post-partum incontinence is often a chronic condition which plaintiff's merchandise is used to treat. *See* Plaintiff's Expert Report, Exhibit 2, at 4; Gov. Exhibit 24, ECF 40-1 Dr. Chughtai Dep. at 74:12-13.[3] Thus, to the extent the subject merchandise is used to treat post-partum incontinence (itself a disputed fact), whether that is an "acute" condition (self-proclaimed by government counsel) or a chronic condition (testified to by a medical expert) also requires trial to resolve.

We set out below many additional examples of material facts which are disputed by the parties, and which make summary judgment inappropriate. The action must proceed to trial.

---

[1] Of course, it is not the "condition of maternity" which is the focus of the use of incontinence products, but the post-maternal and post-partum conditions. Defendant's logic is faulty.

[2] Defendant's failure to cite to any material in the litigation record to support this assertion also renders the assertion defective under the terms of USCIT R. 56(c)(1).

[3] Even third-party witness Anthony Forsberg of Essity/TENA testified that stress urinary incontinence – the type most frequently suffered by post-partum patients – can be a chronic incontinent condition. *See* Gov. Exhibit 31, ECF 40-1, Forsberg Dep. at 40:9-12.

## ARGUMENT

I. **Summary Judgment is Not Appropriate in This Case.**

    A. **The Court's Sole Function in Addressing a Summary Judgment Motion is to Determine Whether There are Disputed Facts Requiring Trial.**

On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F. 2d 66 (Fed. Cir. 1989), *cert. denied,* 493 U.S. 1024 (1990) (citations omitted). "The court may not resolve or try factual issues on a motion for summary judgment." *Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989) (citation omitted).

Here, there are disputed factual issues that are material to the resolution of the action. Whether urinary incontinence is chronic or acute is material in determining the correct classification of the subject goods. Whether the goods are "specially designed or adapted" for the use of persons suffering from urinary incontinence is also contested. The court may not resolve these factual issues on a motion for summary judgment.

USCIT R. 56(a) provides:

> (a) <u>Motion for Summary Judgment or Partial Summary Judgment</u>.  A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense — on which summary judgment is sought. **The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact** and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

(Emphasis added).

USCIT R. 56(c)(1) further provides that:

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

As noted above, the pleadings in this case alone establish that many material facts remain disputed. Pleadings may be considered in determining whether there are disputed issues of fact requiring trial. As this Court held in *Res. Club Ltd. v. United States*, 31 C.I.T. 755, 757 (2007):

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law. USCIT R. 56.3(c). See also *Celotex Corp. v. Catrett*, 417 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed. 265 (1965).

The law in this Circuit is that a motion for summary judgment may be defeated by showing a disputed issue of material fact based on an examination of the pleadings and other sources. *Mayer/Berkshire Corp. v. Berkshire Fashion Inc*., 424 F. 3d 1229 (Fed. Cir. 2005); *see also Ezeah v. Executive Office of U.S. Attorneys*, 2025 U.S. Dist. LEXIS 138908 (D.D.C. 2025); *Mishko v. Redleo Software Inc*., 2025 U.S. Dist. LEXIS 44459 (E.D. Tex. 2025). Several such disputes exist in this case.

### B.    The Court May Not Weigh Evidence on a Summary Judgment Motion.

The law in the Federal Circuit is that "[i]t is the job of the fact-finder – not the Court at summary judgment – to weigh the evidence and make a decision." *Frolow v. Wilson Sporting Goods Co.*, 710 F. 3d 1303 (Fed. Cir. 2013), citing *Anderson v. Liberty Lobby*, 477 U.S. 242 255

(1986);[4] *see also Wi-LAN United States v. Ericsson Inc.,* 675 Fed. Appx. 984 (Fed. Cir. 2017). When making a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case, but to determine whether there is a genuine issue for trial. *See Fifth Third Bank of W. Ohio v. United States,* 55 Fed. Cl. 223 (2003). Even where the Court construes a point of law on summary judgment, the existence of material disputed facts requires the matter proceed to trial. *Abbott Labs v. Torpharm Inc.*, 300 F.3d 1367 (Fed. Cir. 2007).

In *Cyber Power Sys. (USA) Inc. v. United States,* 560 F. Supp. 3d 1347 (Ct. Int'l Tr. 2022), in deciding a summary judgment motion, the court held that there was "no dispute that a 'simple assembly' does not substantially transform merchandise", but "there [wa]s dispute … as to what constitutes a 'simple assembly.'" *Id*. at 1553.  The court denied summary judgment because there were triable issues of facts necessary to determine whether there was substantial transformation of the merchandise at bar in that case. Similarly, here, there is no dispute that articles used only for acute or transient disability are excluded under subheading 9817.00.96, HTSUS. However, there is dispute on what constitutes acute or transient disability, which is essential to determine whether the goods would be classified under the Nairobi Protocol and subheading 9817.00.96, HTSUS, and there are also disputed issues concerning the extent to which the subject merchandise is used for particular patients and maladies.

Weighing evidence and performing fact-finding at summary judgment "is an inappropriate exercise, at either the appellate or the district court level." *Lemelson v. TRW, Inc*., 760 F.2d 1254, 1260 (Fed. Cir. 1985) (citing *Fountain v. Filson*, 336 U.S. 681, 683 (1949); *see also Ideal*

---

[4] As noted in *Anderson v. Liberty Lobby, supra,* "[a]t the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. 477 U.S. at 242-43.

*Innovations, Inc. v. United States*, 2021 U.S. App. LEXIS 35730 (Fed Cir. 2021). As noted in *Anderson v. Liberty Lobby*, 477 U.S. at 242, 249 (1986), "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

### C.    The Government Agrees That Chronic Incontinence is a "Handicap."

The Nairobi Protocol to the Florence Agreement, as implemented by subheading 9817.00.96, HTSUS, provides duty-free treatment for goods "specially designed or adapted for the use or benefit of physically handicapped persons." *Sigvaris, Inc. v. United States*, 227 F. Supp. 3d 1327. Further, "(i) articles for acute or transient disability; (ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled; (ii) therapeutic and diagnostic articles; or (iv) medicine or drugs" are excluded under subheading 9817.00.96, HTSUS by U.S. Note 4(b), Subchapter XVII, Chapter 98, HTSUS. Further, "'[P]hysically or mentally handicapped persons' includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working." U.S. Note 4(a), Subchapter XVII, Chapter 98, HTSUS. The court in *Danze, Inc. v. United States*, 319 F. Supp. 3d 1312 (Ct. Int'l Tr. 2018), interpreted this definition as "liberally construed so as to encompass a wide range of conditions, provided the condition substantially interferes with a person's ability to perform an essential daily task." *See Sigvaris, Inc. v. United States*, 227 F. Supp. 3d 1327 (Ct. Int'l Tr. 2017), aff'd, 899 F.3d 1308 (Fed. Cir. 2019).

Defendant has admitted that chronic incontinence is a handicap which impairs persons from carrying on everyday life activities, and that items specially designed to allow a person to cope with the condition qualify for classification under subheading 9817.00.96, HTSUS. *See* Exhibit 1.[5]

The subject goods are marketed to large healthcare companies, such as Attends, Cardinal Health, Essity and EMA Medical. *See* Gallagher Dep. at 86:25-87:2-8. The goods are incontinent products "design[ed] to hold disposable and reusable absorbent pad for use by adults and children afflicted with permanent or chronic incontinence problems." *See* Gallagher Dep. at 87:16-21.[6] Defendant conducted a deposition of plaintiff's expert witness, Dr. Bilal Chughtai, to further investigate chronic incontinence and agreed that chronic incontinence is a handicap that impacts different types of patients. *See* Gov. Exhibit 24. Nonparty witness Mr. Jeffrey Dietrich of Attindas, explained that through sales tracing, he discovered that about 90 percent of company's sales are made to hospitals. *See Gov*. Exhibit 23, ECF 40-1, Dietrich Dep. at 9:11-22, 10-12. However, Mr. Dietrich also testified that his company ships "to national and regional distributors who in turn sell the product to different health care-type facilities; like hospitals, nursing homes, in some cases home care dealers." *Id.* at 9:5-9. He also testified that these products "can be used in nursing homes. The fixation pants are used with a separate pad[.]" *Id.* at 9:21 – 10:1. He attributed his company's strength in selling to hospitals on the fact that some competitors, namely First Quality and Essity, do not compete in that market channel. *Id.* 21:22-21:2. On cross-examination, he

---

[5] This admission is in line with Customs' decades-old position that chronic incontinence is a handicap for purposes of subheading 9817.00.96. *See e.g., Customs Headquarters Ruling 085084 of May 10, 1990; Customs Headquarters Ruling 085092 of May 10, 1990.*

[6] *See also* Forsberg Dep. at 16:20-25.

testified that the company's product's sales to "hospitals and nursing homes would be roughly the same, but less than home care. *Id.* at 19:12-16.[7]

Defendant assumes, without evidence, fixation pants delivered to hospitals are used exclusively for acute or post-partum care There is nothing in the record to support this supposition. One may observe that persons who reside in nursing homes, elder care homes, and rehabilitation facilities, who suffer from chronic incontinence, are frequently transferred to hospitals for medical attention. It may also be observed that incontinence itself is not a condition typically requiring hospitalization.

However, there has been no determination of how much of the products are being used for chronic care and whether the product being utilized by a hospital automatically means the product is designed for acute or transient conditions. While defendant's counsel assumes without evidence that post-partum incontinence is an "acute" condition, this position is disputed by plaintiff's expert Dr. Chughtai, who defined urinary incontinence as a chronic condition lasting "greater than three months and can be lifelong" based on International Continence Society guidelines. *See* Chughtai Dep. at 13:13-14:21; s*ee also* Forsberg Dep. at 40:9-12.

The Government also agrees that there are varying types and degrees of incontinence and the subject product does not cure urinary incontinence like medicine could. The product also does not qualify as a cosmetic article since it is supposed to be worn underneath clothes. Further, patients suffering from urinary incontinence may be too embarrassed to speak to someone about it and instead, manage the incontinence with the subject product. *See* Chughtai Dep. at 29:6–25.

---

[7] Mr. Forsberg of Essity/TENA testified regarding sales to "nursing homes that are attached to hospitals", *see* Forsberg Dep. at 30: 8-9, indicating that a sale to a hospital may include a sale of products for use in hospital-affiliated nursing homes.

**II.    Numerous Material Facts in Dispute Preclude Summary Judgment.**

Despite the Government's motion for summary judgment, the parties are still in dispute over many of the material facts in this case and trial will be required for the Court to weigh competing and conflicting evidence.

The Government's motion makes three principal arguments, (1) that the subject merchandise is no different than regular underwear, e.g., women's "boy shorts," (2) that the use of the product to treat post-partum incontinence constitutes "acute" care, disqualifying it from classification under subheading 9817.00.96, HTSUS, and (3) that the *Sigvaris* factors weigh against finding the subject merchandise is classifiable within the Nairobi Protocol. As explained below, and as demonstrated by the discovery materials, there are material facts in dispute regarding all three of the Government's arguments.

**A.    Common Features With "Regular" Underwear.**

Throughout its motion paper, the government notes that plaintiff's fixation pants have features in common with underwear worn by non-handicapped individuals. These include such features as knit polyester construction, fabric flexibility waistbands and leg openings. The government cites the visual and tactile similarity of plaintiff's goods with women's "boy shorts," presumably worn by non-handicapped individuals. *See* Def. Br. at 22, 20, 25, 26, and commonalities with the design of a pair of "frugal" disposable underwear sold by the Bob Barker Company to prisons.

This argument completely misses the point and fails to address the relevant legal test. The test is not whether plaintiff's fixation pants have features in common with pants not intended for use by the incontinent — after all, anatomical constraints limit the ways in which one can cover the human derriere — it is whether the merchandise at bar has *additional* or *special* features that

adapt it for the use of benefit of a handicapped person.[8] The Complaint in this action, ECF 10, squarely identified six (6) physical characteristics of the fixation pants are bar which do **not** appear in ordinary underwear:

➢ Wide waistband but substantial spandex content, designed to hold the pant tight across the wearer's midriff.  Complaint at ¶ 15;

➢ Elasticized leg openings, designed to keep the pant snugly on the wearer's body, and to prevent slippage and seepage. *Id.* at ¶ 16;

➢ Elastic bands sewn around the circumference of the garment, designed to keep the garment snug against the wearer's body to ensure the absorbent pad placed inside the pant remains in position. *Id*. at ¶ 17.

➢ Seamless side construction, which allows the garment to remain figure-hugging and tight over the wearer's body. *Id.* at ¶ 18;

---

[8] In this regard, defendants' own Customs rulings recognize that goods specially designed for handicapped use and classifiable under subheading 9817.00.96, HTSUS, have features in common with articles not intended for such uses. Thus, for example, in *New York Customs Ruling N31147 of May 26, 2000*, foam floor puzzles, having all the features of regular toy foam floor puzzles, were classified under subheading 9817.00.96 HTSUS, because they featured raised braille letters designed to help visually impaired children develop tactile and other skills.

In *New York Customs Ruling 330400 of February 7, 2023* raised toilet seats, designed to replace regular toilet seats and measuring 4" and 6" high, were held secondarily classifiable under subheading 9817.00.96, HTSUS, because they assisted people with mobility issues in setting down on and getting up from a toilet (again, there are only so many ways to accommodate the human *derriere*). But these raised toilet seats unquestionably had design features in common with regular toilet seats.

In *New York Customs Ruling N305952 of September 11, 2019*, wall-mounted bath and shower seats here held to qualify for classification under subheading 9817.00.96, HTSUS. They had design similarities to suits for the non-handicapped, but were set apart by special features allowing them to be installed in showers and bathtubs. *See also, Customs Headquarters Ruling 557458 of October 28, 1993*.

In *New York Customs Ruling R02361 of September 1, 2005*, level access shower floors, featuring drainage traps, and half-height shower doors, were all held to be eligible for Nairobi Protocol treatment because they were specially designed to accommodate a user in a wheelchair.

➢ The lack of a gusset in its construction. *Id.* at ¶ 19;

➢ The deeper crotch construction, which is designed to accommodate the absorbent pads in the two-piece incontinence fixation system. *Id.* at ¶ 20.

Defendant's Answer denied each of these allegations, placing these material facts in dispute. Its motion for summary judgment does not engage with any of these allegations, leaving these facts regarding special design in dispute.

Defendant's summary judgment motion does not identify any underpants, designed for general use, which incorporate any of these features. It does not invite the Court's attention to any "regular" underwear, which features elastic bands around the circumference, which are seamless, which feature a wide elasticized waistband (color-coded with a system used by the health-care industry), *see* Gallagher Dep. at 52, which lack a gusset, or which feature a deeper-than-usual crotch construction. While the Government points to the fact that the "women's boy shorts" are circular knit, they contain none of the other features. And, as plaintiff's President Joseph Gallagher testified when shown those shorts, they have a gusset, which (a) renders them not seamless, and (b) distinguishes them from the merchandise at bar. *See* Gallagher Dep. at 144, 146, and 148.

Similarly, while defendant claims to have identified a "disposable" prison pant without a gusset, it has introduced no evidence that the pant features any of the other special design features identified in the Complaint, nor that the pant is a "regular" pant a non-handicapped person might usually purchase.[9]

Not only has defendant failed to resolve any of the disputed material issues of fact concerning the special design of the merchandise at bar, it has basically failed to engage with plaintiff on any of them. It will be for the Court to hear evidence and make findings of fact at trial.

---

[9] The lack of a gusset might be part of the punishment.

14

Joseph Gallagher, plaintiff's President, testified at length about the special design features of Viecura's fixation pant in his deposition. Mr. Gallagher testified that the waistbands were a special design feature. *See* Gallagher Dep. at 32:23. Mr. Gallagher testified that the waistband has a lot of elastic in it because "we know that stops what we call slippage, stops the pant moving down." *See* Gallagher Dep. 33:15-17. Mr. Gallagher testified that the specially designed waistbands were generally over one inch in height. *See* Gallagher Dep. at 34:4. Mr. Gallagher also testified that the waistband was ribbed because the structure was better for fixation. *See Gallagher* Dep. at 34:5-7. Mr. Gallagher testified that this waistband was present on the samples of models at issue in this case. *See* Gallagher Dep. at 47:3-4, 53:6-8, 56:18-20, 64:19-21, 65:15-18, 72:1-21. Mr. Gallagher testified that the seamless construction which allows the garment to remain figure hugging and tight over the wearer's body was a special design feature. *See* Gallagher Dep. at 39:5, 40:12-13.[10] Mr. Gallagher also testified that this feature was present in samples of the subject merchandise. *See* Gallagher Dep. at 55:23, 105:3, 138:10.

Mr. Gallagher also testified that he agreed the elasticized leg openings were special design features and that these features were different from those found on normal underwear. *See* Gallagher Dep. at 16:10. Mr. Gallagher testified that the elastic bands sewn around the circumference of the garment were also a special design feature. *See* Gallagher Dep. at 33:18-23, 35:21-22. Mr. Gallagher testified that the elastic sewn in the circumference of the garment allowed the pants to hold an incontinence pad in place. *See* Gallagher Dep. at 39:10-20. Mr. Gallagher

---

[10] Mr. Forsberg of Essity/TENA testified that with regard to the mesh pants sold by his company, "there are a few components that are involved in ensuring we don't have leakage. One of the components is that the products has what we call a close body fit so it's held securely in place, it doesn't move and is as close to where fluid comes out of the body as possible." *See* Forsberg Dep. at 16:20-25. He also testified that "fabric making, including elasticity, is part of it." *Id.* at 17:10.

testified that these threads were present in samples of the imported merchandise. *See* Gallagher Dep. at 47:7-8, 56:18-21, 64:20, 72:16-17, 76:21-25.

Mr. Gallagher also testified about the lack of a gusset in the subject merchandise being a special design feature. *See* Gallagher Dep. at 40:19, 41:15-16. A gusset is an additional piece of fabric sewn into an undergarment to ensure a seam is in the genital area. Mr. Gallagher testified that samples of the subject merchandise lacked the gusset because the wearer's genitals would be in contact with the affixed pad, rather than the pants. *See* Gallagher Dep. at 47:7, 65:17-18. Finally, Mr. Gallagher also testified about the deeper crotch construction in the products at issue. Mr. Gallagher agreed that the deeper crotch construction was a special design feature. *See* Gallagher Dep. at 45:9-46:2.

Mr. Gallagher also testified that there were substantial differences between the subject merchandise and regular underwear, i.e., boy shorts. *See* Gallagher Dep. at 144. Mr. Gallagher testified that "I don't see how it would be used as a fixation pant" and that it was "a totally different product." *Id.* In addition, there are factual issue regarding the Bob Barker Company briefs used in prison settings. The witness from the Bob Barker Company, Ashlee Juneau, testified that the product sold by the company was only designed to be worn for a few days, *see* Gov. Exhibit 28, ECF 40-1, Juneau Dep. at 9:7-11, 11:8-12, featured no elastic, *id.* at 12:16, 17:10, 18:18 and was not meant to be worn with a pad or be used by the incontinent, *id.* at 17:18. Meanwhile, Mr. Gallagher testified that plaintiff's product was designed to be washed over fifty times, *see* Gallagher Dep. at 49:12, features elastic bands, *id.* at 33:18-23, 35:21-22, and is designed to hold an incontinence pad in place, *id.* at 28:25-29-4. In addition, plaintiff submits that there is a factual dispute as to whether the prison briefs are circular knit. The Bob Barker Company witness testified

16

that the product had an area "where the two sides come together" and that she did not know "the exact procedures on how they're put together." *See* Juneau Dep. at 26:13-18.

"It is the job of the fact-finder – not the Court at summary judgment – to weigh the evidence and make a decision." *Frolow v. Wilson Sporting Goods Co*., 710 F.3d 1303 (Fed. Cir. 2013), *citing Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) What the Government is requesting the Court to do at this stage is to weigh the record evidence regarding the special designed features and determine that they are the same as in normal underwear, or boy shorts. This is improper on summary judgment and will require a trial. "Weighing [evidence] – no matter how decisively the scales may appear to tip – is a matter for trial, not summary judgment." *Tesler v., Miller-Howard Invs. Inc*., 2019 U.S. Dist. LEXIS 32831 (S.D. Ind. 2019).

### B.    Disputed Facts Regarding if Post Maternity Incontinence is a Chronic or Acute/Transient Condition

The Government asserts in its motion — without citation to a shred of authority or evidence[11] — that post-maternity care and hospital care in which plaintiff's product is used are acute or transient conditions, not satisfying the requirements for Nairobi Protocol treatment.[12] Plaintiff asserts otherwise, offering the testimony of its medical expert Dr. Bilal Chughtai and medical literature, that post-partum incontinence may be, and often is, a chronic condition.[13] The

---

[11] Under USCIT R. 56(c), assertions made in a motion for summary judgment must be supported by information in the record, discovery materials or affidavits.

[12] It may be observed that elderly patients from nursing homes, rest homes and other institutions are not infrequently transferred to hospital for treatment of medical conditions. To the extent these patients are suffering from chronic incontinence, it may not be assumed that all incontinence patients in a hospital suffer acute or transient incontinence.

[13] Dr. Chugtai testified, for example, that after giving childbirth mothers may suffer from pelvic prolapse, a weakening of the pelvic floor muscles that leads to urinary incontinence. *See* Chughtai Dep. at 72:14. He also testified that this condition tends to grow more pronounced the more children a woman bears, and that he frequently counsels women to live with the incontinence

record developed for trial in this case contains evidence showing that post-partum incontinence is often a chronic condition and many of the people who use the product in hospitals suffer from chronic incontinence, but are seeking treatment for another acute issue not related to the incontinence.[14]

While asserting that post-partum incontinence is an "acute" condition, defendant offers the Court no definition of the term "acute." "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." *Carl Zeiss, Inc. v. United States,* 195 F.3d 1375, 1379 (Fed. Cir. 1999). In interpreting the terms of a tariff provision "[a] court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Id.* The government does not offer a specific definition of acute or transient disabilities, but does refer to them as temporary conditions. Def. Br. at 10.

The *Merriam-Webster Dictionary* defines acute as "of rapid onset and relatively short duration." The dictionary also says that acute illness is "being, providing, or requiring short-term medical care." *See* Merriam-Webster Dictionary, definition of "acute," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/acute (last accessed August 29, 2025). The *Merriam-Webster Dictionary* defines "chronic" as "continuing or occurring again and again for a long time." The dictionary also says that a chronic illness is "being, providing, or requiring long-

---

to complete their family before seeking more aggressive treatment to address the prolapse. *Id.* at 1: 21-25; 12: 2-25; 13: 2-15; 74:17-75:15.

[14] We also note that Customs has ruled that where an incontinence product, such as a diaper designed for older children, had special features, such as channels to hold urine which has not yet been absorbed by an absorbent pad, this showed special design for use by the handicapped. In that same ruling, Customs noted that the fact that the product could be used by persons suffering post-partum or post-operative incontinence did not disqualify it from classification under HTS subheading 9817.00.96. *See Customs Headquarters Ruling 556449 of March 25, 1996.*

term medical care (as for a chronic disease)." *See* Merriam-Webster Dictionary, definition of "chronic," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/chronic (last accessed August 29, 2025). During his deposition Plaintiff's expert witness, Dr. Bilal Chughtai, testified that in "differing an acute from a chronic condition" the typical definition of "chronic conditions is greater" than three months. *See* Chughtai Dep. at 13:20-14:6.

As an initial matter, the Government admits that the condition of chronic incontinence is a handicap, which falls within the scope of the Nairobi Protocol. *See* Exhibit 1. Customs has held the same in numerous Customs Rulings. *See, e.g., Customs Headquarters Ruling 297341 of November 13, 2018, Customs Headquarters Ruling W562506 of October 28, 2002, Customs Headquarters Ruling 560278 of October 7, 1997, Customs Headquarters Ruling 960056 of January 30, 1997, Customs Headquarters Ruling 558958 of March 25, 1996.* However, there is some disagreement between the parties on other forms of incontinence, mainly postpartum incontinence, and whether the condition qualifies as a handicap under the Nairobi Protocol.

Plaintiff's expert witness, Dr. Chughtai, also testified in his deposition that urinary incontinence following childbirth "can last three to nine months postpartum, but for some patients it can be lifelong from there." *See* Chughtai Dep. at 74:12-74:14. This description stands completely contrary to the Government's unsupported assertion that "the acute care market [is] comprised mostly of maternity care users, where the Viecura underpants and maternity pads would be used to manage normal after-birth discharge and blood." Def. Br. at 24. Giving birth to a child is a significant medical episode for a woman which can have effects on her body for weeks to months to even years after birth. Although many women can have post-partum incontinence that last for fewer than three months, many have issues that last longer. As Dr. Chughtai testified "the human body doesn't always follow zeros and 100s." *See* Chughtai Dep. at 24:4-24:5. Many women

can experience post-partum incontinence that can be chronic and last for longer than three months. There are factual issues regarding the Government's material facts regarding post-partum incontinence that warrant trial.

The Government also relies heavily on the idea that the use of the incontinence pants in hospitals is to treat acute or transient conditions and not chronic conditions. However, this factual assertion misconstrues the way those who suffer from chronic incontinence receive care in the hospital. Joseph Gallagher testified that subject merchandise used in hospitals was used in the geriatric ward. *See* Gallagher Dep. at 30:16-31:3. Geriatrics is "a branch of medicine that deals with the problems and diseases of old age and the medical care and treatment of aging people." *See* Merriam-Webster Dictionary, definition of "geriatric," Merriam-Webster.com, https://www.merriam-webster.com/dictionary/geriatiric (last accessed August 29, 2025).

The Government's assertion that the subject merchandise is used to treat acute or transient conditions is incorrect and unsupported, to the extent these products are used in hospitals' geriatric wards. The elderly are the most common users of the subject merchandise and the most common suffers of chronic incontinence. *See* Exhibit 2 at 3. These products are simply used to treat the already chronic incontinence suffered by these patients when they are in the hospital for another reason.  Certainly, a hospital admittance is not the way someone complaining to a doctor about incontinence would receive treatment. *See* Chughtai Dep. at 20:13-21:22:7. However, it is where a person who wears the subject merchandise at home would go to receive treatment for a heart attack or other life threatening acute medical condition. While receiving this treatment, the patient's chronic incontinence does not simply go away, they would still need to use the subject merchandise for the incontinence.

The Government also focuses in on some fugitive uses of the product such as for bleeding control or wound care. Def. Br. at 24. However, as Mr. Gallagher testified, this is not the intended use of this product and is not what the product was created for. *See* Gallagher Dep. at 140:13-140:15, or what it is approved for by the FDA. Mr. Forsberg of Essity/TENA also testified that "[a]s it relates to wound care, this product has nothing to do with wounds." *See* Forsberg Dep. at 19:16-18. When the product is in the customer's hands its uses are up to the customer, but the incontinence fixation pants were not created to treat wounds or to hold dressing in place. The subject merchandise is registered with the FDA as an incontinence product and not as a wound care product. *See* FDA Filings, Exhibit 3. As such a disputed fact exists over the use of the product as a wound care treatment.

It is well-established that, in classification cases such as this one, courts do not base classification decisions on "fugitive uses." *See Stewart-Warner Corp. v. United States*, 748 F.2d 663, 669 (Fed. Cir. 1984); *In-Zone Brands Inc. v., United States*, 456 F. Supp. 3d 1309 (Ct. Int'l Tr. 2020).

There are major disputed issues of fact regarding the uses of plaintiff's product, and the status of post-partum incontinence. These issues cannot be resolved on summary judgment. The Court should receive evidence at trial concerning these issues from plaintiff's witnesses and defendant's (if they have one). They are neither ripe nor appropriate for decision on a summary judgment motion.

## C.     There are Disputed Facts Concerning the Sigvaris Factors.

The Government relies heavily on the factors laid out in *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1314 (Fed. Cir. 2018), which govern the factual issues to be evaluated in determining

whether a good qualifies for secondary classification under subheading 9817.00.96, HTSUS. Plaintiff alleges factual disputes regarding these factors and their application to this case.

The Federal Circuit, in *Sigvaris* adopted Customs' administrative test to determine if an article qualifies for Nairobi Protocol treatments. The five-factor test examines (1) the physical properties of the merchandise, (2) whether the merchandise is solely used by the handicapped (3) the specific design of the merchandise (4) the likelihood that the merchandise is useful to the general public and (5) whether the merchandise is sold in specialty stores. *Sigvaris, Inc. v. United States*, 899 F.3d 1314 (Fed. Cir. 2018).

In examining the physical properties of the merchandise, the Government relies upon its analogy to the regular undergarment, boy shorts. As is demonstrated by the record evidence, there are numerous disputed material facts as to whether the two products are comparable. Contrary to the Government's assertions, Mr. Gallagher testified that "I don't see how it [boy shorts] would be used as a fixation pant" and that it was a totally different product. *See* Gallagher Dep. at 144-145. As detailed above, Mr. Gallagher testified at length about the special design features of the subject merchandise and how they assist patients with urinary incontinence. In order to reach conclusion on this factor, the Court will be required to weigh evidence at trial.

The second factor is whether the merchandise is solely used by the handicapped. Plaintiff notes that the test is not whether the merchandise is solely for use by the handicapped, but rather "[a]rticles specially designed for handicapped persons must be made with the specific purpose and intent to be used by or benefit handicapped persons rather than the general public." *Sigvaris, Inc. v. United States*, 227 F. Supp. 3d 1327, 1336 (Ct. Int'l Tr. 2018). However, use by a small part of the general public does not disqualify an article from fitting into the tariff provisions. *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1314 (Fed. Cir. 2018) (citing Customs Implementation, 28 Cust.

Bull. & Dec. at 242-45). Customs has long recognized that "fugitive uses" of a product specially designed for the handicapped do not disqualify the article from the classification. This is laid out in Customs' test to evaluate products, which was adopted by the Federal Circuit in *Sigvaris. See, e.g., Customs Headquarters Ruling 561223 of March 26, 1999*, *New York Customs Ruling N350595 of June 27, 2025, New York Customs Ruling N349015 of June 11, 2025.*

It is a well-established principle of tariff classification that products should not be classified based on fugitive uses. *Eastalco Aluminum Co. v. United States*, 10 C.I.T. 622, 624 (1986) (*citing United States* v. *Baltimore & Ohio Railroad Co.*, 47 C.C.P.A. 1, 5-7 (1959)). The use of these products by the general public is purely a fugitive use as envisioned in the test. Mr. Gallagher testified that a lot of people would find using the subject merchandise uncomfortable. *See* Gallagher Dep. at 36:13-36:16, 41:19-22, 44:20-24. In particular, Mr. Gallagher notes the lack of a gusset on the subject merchandise and the tightened leg openings on the product would be uncomfortable for the public. A gusset is specifically sewn into undergarments for comfort and breathability. The gussets are sewn in to make sure that there are no seams in the genital area of the garment. *See* Gallagher Dep. at 41:10-22.

The third factor is the specific design of the merchandise. Similarly to the physical properties factor, the Government relies on its mistaken analogy to regular under garments, like boy shorts. Plaintiff incorporates its reference to the material facts in dispute mentioned above and maintains that in order to reach conclusion on this factor the Court will be required to weigh evidence at trial.

The fourth factor is the likelihood that the merchandise is useful to the general public. The Government again relies on its analogy to regular underpants to support this point. Mr. Gallagher testified that without a gusset the subject merchandise would be uncomfortable to wear and that it

could cause injury to genitalia. *See* Gallagher Dep. at 36:16, 41:19-42:3, 44:21-22. Again, to reach conclusion as to this factor, the Court will be required to weigh evidence at trial.[15]

The final factor is whether the merchandise is sold in specialty stores. As the depositions indicate, Viecura does not sell the fixation pants in stores, but purely in a business-to-business context. Its customers, as well, sell mainly in a business-to-business context, selling the goods to institutional purchasers. Plaintiff questions the notion of "specialty stores" in the current e-commerce environment, when goods may be offered on a digital platform, but often through a specialty store site located on the platform. Today, with the access online to e-commerce stores, the general public has access to purchase anything in a click or two.

On the record, there is significant evidence of sales to hospital supply companies in bulk for institutional use. Mr. Gallagher testified that the bulk of the product that Viecura sells goes to institutional healthcare. *See* Gallagher Dep. at 116:2-3, 134:19-20. Mr. Gallagher also testified that there was a growing market for at-home- care for the elderly, *see* Gallagher Dep. at 116:8-19, which results in the sale of smaller packages directly to consumers.

---

[15] The testimony also indicates that the products are mostly sold in business-to-business transactions, with two bags of 25 shorts to a box, although sales of smaller quantities to home caretakers are increasing. Mr. Forsberg of Essity/TENA also testified that his responsibilities in market the subject merchandise includes managing "a team of nurses that go into institutions and provide education on the safe and effective use of the product". *See* Forsberg Dep. at 8:19-23. This hardly seems like the way "regular" underpants are marketed.

## <u>CONCLUSION</u>

As noted above, there are multiple material issues of fact in this case which remain disputed. For the reasons set forth herein, this Court must deny the Government's motion for summary judgment and issue an order directing the parties to prepare for trial.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff*

<u>/s/ John M. Peterson</u>
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
Sanzida Talukder
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Herbert J. Lynch
Sullivan and Lynch, PC
800 Turnpike St., Suite 300
North Andover, MA 01845
Lynch@s-l.com

Dated: August 29, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JOSEPH A. LAROSKI JR., JUDGE**
-------------------------------------------------------------------- X
VIECURA INC.                                             :
                                                         :
            Plaintiff,                                   :
                                                         :
            *v.*                                         :          **Consol. Court No. 21-00154**
                                                         :
UNITED STATES,                                           :
                                                         :
            Defendant.                                   :
-------------------------------------------------------------------- X

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 7,739 words.

Respectfully submitted,

/s/ Patrick B. Klein
Patrick B. Klein